

In The
Court of Appeals
Seventh District of Texas at Amarillo

_____

No. 07-18-00333-CV
_____

DANA DANIELS, APPELLANT

V.

ALLSUP'S CONVENIENCE STORES, INC., APPELLEE

On Appeal from the 223rd District Court
Gray County, Texas
Trial Court No. 37,775; Honorable Philip N. Vanderpool, Presiding

March 26, 2020

OPINION

Before QUINN, CJ., and PIRTLE and PARKER, JJ.

Appellant, Dana Daniels, appeals from an *Order of Dismissal* entered following a directed verdict granted in favor of Appellee, Allsup's Convenience Stores, Inc. ("Allsup's"), following a jury trial, in his premises liability suit. On appeal, Daniels contends that the trial court erred by directing a verdict in favor of Allsup's and dismissing his suit when there was more than a scintilla of evidence at trial, raising a question of fact,

concerning whether Allsup's had actual or constructive knowledge of an unreasonably dangerous condition on its premises (a loose facia board on its store awning, suspended precariously over a pedestrian walkway) yet failed to protect Daniels, an invitee. We reverse the trial court's *Order of Dismissal* and remand this cause for a trial on the merits.

### FACTUAL BACKGROUND

In August 2015, Daniels filed his *First Amended Original Petition* alleging that in April 2014, he exited an Allsup's convenience store through the front doors after making several purchases and was suddenly struck by a plywood facia board that had come loose from a storefront awning. Daniels alleged that Allsup's knew or should have known that the defective condition of the premises created an unreasonable risk of harm to its customers and by failing to properly inspect the awning for latent defects, warn its customers of the existing defect, protect its customers from the risk presented by some type of barrier, or repair the defective condition, Allsup's breached a duty of ordinary care that it owed to its invitees. In August 2018, a two-day jury trial was held, and the following evidence was presented in Daniels's case-in-chief.

LaTisha Velasquez, Allsup's store manager trainee, testified that on April 13, 2014, the store experienced high winds with gusts of up to sixty miles per hour. While she was off-duty, she received a call from one of her employees who informed her that the store's awning was flapping. When she arrived at the store, she inspected the awning from the ground and noticed that a section of the facia board had come loose. She thought the condition of the awning and the flapping of the facia board was significant enough to call Michael Schale, her area manager. She reported to him that the defective condition of the awning should be repaired as soon as possible.

2

Velasquez also testified that when she made her inspection, she did so from the ground and did not climb a ladder to inspect the roofing materials behind the facia board. Her inspection was the first time she had noticed the facia board coming loose. She had never experienced a piece of plywood sheathing coming loose and falling. After inspecting the awning, she continued to perform her regular duties. She did not work the day of Daniels's injuries.

Evan Merrell, an Allsup's employee, was working behind the counter at the cash register when the plywood facia board fell and hit Daniels. He testified that Daniels entered the store and purchased a lottery ticket. After exiting the store, Daniels re-entered and bought a second lottery ticket. When Daniels exited the store a second time, Merrell heard a loud boom, glanced out the door, and saw Daniels lying flat on the ground with the plywood facia board atop his body. He immediately called 911 and the area manager. Prior to the plywood facia board falling on Daniels, Merrell had never seen anything hanging from the awning or a section of awning fall from the roof.

Schale, Allsup's area manager, testified the weather the day before Daniels was injured included sideways rain and heavy winds. According to his account, the storm was not typical for weather in the Panhandle and was of the type of wind that could cause damage to structures. In fact, he doubted that anyone would even be driving in the storm because the wind was so great and the rain was blowing sideways. That evening, he received a call from an employee at the Allsup's store in question, who informed him that a piece of "awning" was flapping. He then spoke to a second employee who had been employed by the store for a longer period of time and asked her about the flapping. She

3

responded that he need not be concerned. He asked her if he needed to rope anything off and the second employee replied "[n]o, it's just flapping in the wind."

The next morning, Schale arrived at the store two hours early, around 6:30 a.m., to make sure something unusual had not occurred during the storm. He did not get a ladder to inspect the awning because the wind was still blowing, and the store's ladder would not reach that high. He stood underneath the awning and looked up. He saw a twelve-inch-by-eighteen-inch portion of the facia board flapping. At that time, he was not concerned for the safety of his employees or customers and saw no need to rope off the section or to immediately call maintenance. In his twenty years with Allsup's, he had never seen an incident where an entire section of facia board had broken loose and fallen to the ground. Typically, the storefront awnings only suffered hail damage or flapped after high winds.

Allsup's normal procedure in such an instance was to call maintenance, who would then inspect the awning and make an evaluation. Only if the decorative plastic tiles were loose, would he tack them to the plywood underlayment. If the work was going to be more extensive than that, he would call a professional sign company. Because maintenance was already scheduled to be at that particular store around noon that same day, Schale did not make a call for immediate maintenance but instead left word at the store to have the maintenance man call him when he arrived.

Between 11:00 a.m. and 12:00 p.m., the maintenance man arrived at the store as scheduled. Schale was away from the store at the time. Before the maintenance man could commence his duties, the plywood facia board fell, striking Daniels. When it fell, Schale received a call from the store informing him that a four-foot-by-eight-foot section of plywood facia had fallen to the ground and injured a customer. Schale testified that the plywood fell "due to high winds and weather." After the incident, a professional sign company was called to make the necessary repairs.



Allsup's Convenience Store showing repaired facia board.

Daniels testified that on the day of the incident, he purchased gas and lottery tickets at Allsup's.[1] When he entered the store, he observed no warning signs or cones in front of the store and no area had been cordoned off to prevent pedestrians from walking under the loose facia board. The last thing he remembered was scratching a lottery ticket before everything became a blur. Daniels's testimony concluded his case-in-chief.

Thereafter, Allsup's moved for a directed verdict asserting Daniels had not presented any evidence that, prior to the incident, Allsup's had actual or constructive notice that the flapping facia board presented an unreasonably dangerous condition. After hearing legal arguments, the trial court granted a directed verdict in favor of Allsup's. An *Order of Dismissal* was subsequently entered by the trial court reflecting that the

---

[1] Prior to his testimony before the jury, he testified outside the jury's presence on issues related to damages.

directed verdict was granted on "grounds that [Daniels] failed to prove, as a matter of law, any negligence on the part of [Allsup's]."

### STANDARD OF REVIEW

When reviewing a judgment or order granting a directed verdict in favor of the defendant, the proper standard of review an appellate court should apply is the same standard it would apply in reviewing a judgment granting a defensive motion for summary judgment. *Collora v. Navarro*, 574 S.W.2d 65, 68 (Tex. 1978). That standard, as generally stated, is that a defendant is entitled to a directed verdict when reasonable minds could draw only one conclusion from the evidence and there has been established, as a matter of law, either (1) an affirmative defense or (2) at least one essential element of the plaintiff's cause of action has been negated. In our review of the directed verdict rendered in this case, our task, as an appellate court, is to determine whether there is any evidence of probative force sufficient to raise a fact issue on the material questions presented. *Id.* As a reviewing court, we must consider all of the evidence in the light most favorable to the party against whom the verdict was instructed (Daniels), discarding all contrary evidence and inferences. *Id.* (citing *Henderson v. Travelers Ins. Co.*, 544 S.W.2d 649 (Tex.1976); *Echols v. Wells*, 510 S.W.2d 916 (Tex.1974)). Should we find that reasonable minds could differ as to the truth of controlling facts, an issue of fact exists, and that issue must go to the jury. *Id.* (citing *Najera v. Great Atlantic & Pacific Tea Co.*, 146 Tex. 367, 207 S.W.2d 365 (1948)).

### PREMISES LIABILITY

Unlike a negligent activity claim, a premises liability claim is based on the principle that the property controlled by the tortfeasor is unreasonably unsafe. Premises liability

6

is, therefore, a special form of negligence in which the duty owed to the injured party depends on that party's status on the premises at the time of the incident. *Scott & White Memorial Hosp. v. Fair*, 310 S.W.3d 411, 412 (Tex. 2010). Generally, a premises owner or occupier, such as Allsup's, owes a duty to keep its premises safe for invitees,[2] such as Daniels, against any condition on the premises that poses an unreasonable risk of harm. *Brinson Ford, Inc. v. Alger,* 228 S.W.3d 161, 162 (Tex. 2007). "The duty owed by an owner or occupier of premises to an invitee is not that of an insurer." *CMH Homes, Inc. v. Daenen*, 15 S.W.3d 97, 101 (Tex. 2000). To impose liability on the owner or occupier of the premises, the claimant must establish that, at the time of the incident, the owner or occupier knew of the dangerous condition or, in the exercise of reasonable care, should have known of the condition of the premises. *Henkel v. Norman*, 441 S.W.3d 249, 251 (Tex. 2014); *Western Invs., Inc. v. Urena*, 162 S.W.3d 547, 550 (Tex. 2005).

An owner's or occupier's knowledge of a dangerous condition can be actual or constructive. *Henkel,* 441 S.W.3d at 251. Actual knowledge is knowledge "of the dangerous condition at the time of the incident, not merely the possibility that a dangerous condition could develop over time." *City of Corsicana v. Stewart*, 249 S.W.3d 412, 413-14 (Tex. 2008) (per curiam). "Constructive knowledge is a substitute in the law for actual knowledge." *CMH Homes, Inc.*, 15 S.W.3d at 102. In premises liability cases, constructive knowledge can be established by showing that the dangerous condition had existed long enough for the owner or occupier to have discovered it upon reasonable inspection. *Id.* "The rule requiring proof that a dangerous condition existed for some

---

[2] "An invitee enters land with the owner's knowledge and for the mutual benefit of both." *Wilson v. Northwest Tex. Healthcare Sys., Inc.*, 576 S.W.3d 844, 850 (Tex. App.—Amarillo 2019, no pet.). Here, it is undisputed that Daniels was an invitee.

length of time before a premises owner may be charged with constructive notice is firmly rooted in our jurisprudence." *Wal-Mart Stores v. Reece*, 81 S.W.3d 812, 815 (Tex. 2002). This so-called "time-notice rule" is not limited to slip-and-fall cases and "is based on the premise that temporal evidence best indicates whether the owner had a reasonable opportunity to discover and remedy a dangerous condition." *Id.* at 816. Thus, in applying this "time-notice rule," courts have analyzed "the combination of proximity, conspicuity, and longevity." *Wal-Mart Stores, Inc. v. Spates*, 186 S.W.3d 566, 567-68 (Tex. 2006) (citing *Reece*, 81 S.W.3d at 816-17).

Several courts, including the Texas Supreme Court and this court, have identified the essential elements of a premises liability cause of action to include the following: (1) the claimant was an invitee, (2) the defendant was a possessor of the premises, (3) a condition on the premises posed an unreasonable risk of harm, (4) the defendant knew or reasonably should have known about the condition, (5) the defendant breached its duty of ordinary care by either (a) failing to make the condition reasonably safe (eliminate the risk) or (b) failing to adequately warn of the premise defect (reduce the risk), and (6) the defendant's breach proximately caused the claimant's injuries. *See Henkel,* 441 S.W.3d at 251-52 (citing *CMH Homes, Inc.*, 15 S.W.3d at 99); *Raines v. Hale,* No. 17-17-00288-CV, 2018 Tex. App. LEXIS 2232, at *6 (Tex. App.—Amarillo Mar. 28, 2018, no pet.) (mem. op.).

### ANALYSIS

Testimony at trial established that wind gusts the night before the incident were upwards of sixty miles an hour, and they were the type of winds that reasonably could have caused damage to the exterior of a building. In fact, the weather that evening was

8

so severe Schale doubted if anyone would be out driving because the rain was blowing sideways. Nevertheless, after receiving a call that someone saw or heard the store's "awning" flapping, Velasquez, Allsup's manager trainee, made an unscheduled visit to the store for the express purpose of inspecting the source of this concern. When she arrived at the store, she visually inspected the awning from the ground because she could not have physically reached the awning, even if she had used the store ladder. She further testified that the damage to the awning was "significant" and she immediately reported it to Schale, Allsup's area manager. She also told Schale that the awning should be repaired as soon as possible.

Schale testified that, whenever an awning was damaged, Allsup's general procedure was to call maintenance to make the necessary repairs. If the repair was extensive and required more than simply tacking down the decorative tiles, then the procedure was to call a sign company to make any significant repairs. When Schale received a second call from another employee reporting that the same awning was flapping, he opted not to immediately call the maintenance man because a third employee had reported that he was not concerned about the flapping. At that point, Schale decided to wait until the next day when the maintenance man was regularly scheduled to visit the store in question.

The peak times at the store were between 6:30 a.m. and 8:00 a.m. Therefore, the next morning, Schale arrived at the store around 6:30 a.m., specifically for the purpose of inspecting the awning and determining if the storm had caused any unusual damage that necessitated immediate repairs. He too did not use a ladder to inspect the awning. From

the ground, he noted that nothing appeared out of the ordinary and he opted not to call the maintenance man a third time.

Around noon, the maintenance man arrived, went to the back of the store, and had coffee before commencing work. Shortly thereafter, an entire section of the plywood facia fell from the awning, striking Daniels as he walked from the store. After Daniels was taken to the hospital, the maintenance man determined that the damage to the awning was substantial enough to require that a sign company be brought in to undertake the repairs.

On appeal, no one contests whether Daniels was an invitee or whether Allsup's was the owner or occupier of the premises where Daniels sustained personal injuries as a direct result of the plywood facia board falling and striking him. While Allsup's does not dispute the fact that it knew about the defective condition of the premises prior to the incident, Allsup's contends it did not know "that a section of plywood had broken loose from the roof." In making this argument, what Allsup's really contests is whether it had actual or constructive knowledge that the condition itself presented an unreasonable risk of harm. Allsup's knew something was wrong with its awning. It just contends it was not aware that the condition of the awning presented a danger to its customers—or at least it was willing to take that risk. By not warning customers that something was wrong with the way the awning was attached to the building or by not roping off the area in which someone could be hit by falling debris, Allsup's was effectively saying that it did not have a problem exposing its customers to whatever danger was present. By moving for a directed verdict, Allsup's contended that Daniels failed to present more than a scintilla of evidence raising a question of fact concerning whether the physical condition of the premises (which Allsup's was clearly aware of through its agents and employees)

10

presented an unreasonable risk of harm to its invitees. Whether a given condition presents an "unreasonable risk of harm" is inherently a fact question and Allsup's certainly did not establish, as a matter of law, that it was not unreasonably dangerous. Daniels presented evidence that the condition of the premises was such that Allsup's allowed a sheet of plywood facia board to break loose from its mooring and strike him. The mere fact that Daniels was injured as a result of the condition of the premises is itself some evidence that the condition of the premises presented some risk of harm.

This is not a slip-and-fall case where the property owner might avoid responsibility for a dangerous condition by saying it was unaware that a dangerous condition existed on its property. Here, Allsup's was aware of the condition—its employees knew, its store manager knew, its area manager knew, and maintenance knew. Yet, even with all of this knowledge, Allsup's did not take any steps to reduce the risk of harm to invitees by repairing or replacing the defective facia board, nor did it take any steps to reduce the risk of harm to its invitees by providing an adequate written or verbal warning or by constructing any type of barrier that would prevent an invitee from walking inside the zone of danger.

Viewing the evidence in a light most favorable to Daniels's premises liability claim, while Allsup's may contend that the danger presented by this particular condition was not *unreasonably* dangerous, it cannot deny the fact that it had notice of the condition. Accordingly, this is not a situation in which the "time-notice rule" would have any application. Allsup's was on notice of the condition of its premises, yet it did nothing to reasonably protect the public until it could determine the extent of the danger presented. Furthermore, should Allsup's rebuttal be that it did not know the condition was dangerous

11

to the public, the evidence shows otherwise—thereby raising a material fact issue. Because a reasonable juror could find a loose piece of plywood facia board, approximately four-feet-by-eight-feet, exposed to the elements (especially wind, which was described as "high" when the awning was inspected by both Schale and Velasquez), suspended several feet above an area where pedestrians routinely walk (directly in front of the front door to the business), presents some risk of harm to an invitee on the premises, we find that there was some evidence that the condition of the premises presented an unreasonable risk of harm to Allsup's invitees and that Allsup's was aware of that risk. Furthermore, notwithstanding its awareness of that risk of harm to its customers, Allsup's failed to warn or protect its invitees in a reasonable manner. It posted no signs, erected no barriers, placed no warning cones, or otherwise restricted public access to the danger zone presented. Because there was more than a scintilla of evidence raising a fact issue concerning whether Allsup's had actual or constructive knowledge of an unreasonably dangerous condition on its premises, yet failed to warn or protect Daniels, an invitee, the trial court erred in granting a directed verdict. Accordingly, we sustain Daniels's single issue.

### CONCLUSION

We reverse the trial court's *Order of Dismissal* and remand this cause to the trial court for a trial on the merits.


Patrick A. Pirtle
Justice


12